# United States District Court

_____ DISTRICT OF _____

| | |
|---|---|
| **In the Matter of the Search of** | **APPLICATION AND AFFIDAVIT** |
| (Name, address or brief deposition of person, property or premises to be searched) | **FOR SEARCH WARRANT** |

THE PREMISES KNOWN AS BRIDGER MINI STORAGE
UNIT #188, 424 BRIAR PLACE, BELGRADE,
MONTANA, FURTHER DESCRIBED IN ATTACHMENT B

CASE NUMBER: MJ-08-05-BU-JCL

I _Bryan Fillinger_ _____ being duly sworn depose and say:

I am a(n) _Special Agent with the Drug Enforcement Administration_ and have reason to believe

that ☒ on the person of or ☒ on the property or premises known as (name, description and/or location)
The premises known as Bridger Mini Storage Unit #188, 424 Briar Place, Belgrade,
Montana, including persons, and vehicles, associated with the premises. See Attachment B

in the _____ District of _____ MONTANA _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
Evidence of a crime; contraband fruits of crime, or other illegally possessed; property
designed for use, intended use, or used in committing a crime.
concerning a violation of Title _____21_____ United States Code, Section(s) _841_ _____.
The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit

Continued on the attached sheet and made a part thereof:    ☒ Yes    ☐ No

_SA Bryan Fillinger_
Signature of Affiant

Sworn to before me, and subscribed in my presence,

_April 10, 2008_
Date

at _Missoula, Montana_
City and State

_U.S. Magistrate Judge_
Name and Title of Judicial Officer

_Jeremiah C. Lynch_
Signature of Judicial Officer

## AFFIDAVIT

I, Bryan Fillinger, being duly sworn, depose and state the following:

1)     I am a Special Agent of the United States Drug Enforcement Administration. I have been a Special Agent for the United States Drug Enforcement Administration since 2003. I am currently assigned to the Missoula, Montana, Post of Duty. Prior to my employment with the Drug Enforcement Administration, I was employed at the Bozeman, Montana, Police Department for approximately seven years.

2)     Specifically, I have conducted or assisted with investigations relative to the manufacture, smuggling and distribution of controlled substances and the subsequent illicit transfer and laundering of the proceeds derived from the sale of controlled substances.   As a result of this investigative activity, I have conducted and/or participated in several state court and federal court authorized wire, oral and electronic intercepts.

3)     Steven Woodson has been a special agent for the DEA since 1992, and is assigned to the Casper, Wyoming Post of Duty.   Prior to his employment with the DEA, SA Woodson was employed as a special agent with the Wyoming Division of Criminal Investigation for six (6) years and as a police officer with the Warrensburg Police Department in Warrensburg, Missouri, for approximately five (5) years.   Since 1986, SA Woodson has worked almost exclusively on narcotics and money laundering violations of both federal and state laws.

4)     Based upon the above the affiant knows the following:

    a.    That controlled substance traffickers/distributors very often place assets in name(s) other than their own (nominee or straw names) to avoid detection of those assets by law enforcement agencies, and that controlled substance

1

traffickers/distributors often maintain residences which are used as a stash house, or locations for controlled substance storage and distribution;

b.    That even though these assets are in nominee names, controlled substances traffickers/distributors continue to use these assets by exercising dominion and control over them;

c.    That often times controlled substance traffickers/distributors maintain on hand large amounts of U.S. currency in order to finance their ongoing controlled substance business;

d.    That controlled substance traffickers/distributors frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of controlled substances;

e.    That controlled substance traffickers/distributors who have access to a computer system, often use this computer to maintain records, receipts, notes, e-mails, etc regarding their illegal enterprise;

f.    That it is common for controlled substance traffickers/distributors to conceal proceeds from the distribution of controlled substances and/or records of locations of proceeds as well as contraband within their premises;

g.    That controlled substance traffickers/distributors commonly travel to purchase and distribution areas to facilitate their trafficking; that after purchasing controlled substances, the traffickers/distributors will transport or cause to be transported, controlled substances to the distribution area; and that the methods of transportation included but are not limited to commercial airlines, private airplanes, rental and private automobiles, and government and contract mail

2

carriers;

h.      That controlled substances traffickers/distributors commonly maintain address or
        telephone numbers in books, electronic or otherwise, and documents which reflect
        names, addresses and/or telephone numbers of their associates in the
        trafficking/distribution organization;

i.      That controlled substance traffickers/distributors take or cause to be taken
        photographs of themselves, their associates, their property, their assets and their
        product, and the photographs are usually maintained at the residences and/or in
        electronic devices;

j.      That based upon my training and experience, I know that controlled substance
        traffickers/distributors have in their possession or control, firearms, including but
        not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and
        other weapons and that the weapons are used to trade for and/or protect and
        secure a controlled substance, proceeds obtained from the distribution of a
        controlled substance and/or the trafficker/distributor;

k.      That based on my training and experience, I know that controlled substance
        traffickers/distributors frequently maintain hidden compartments within their
        residence and vehicles, as well as bury controlled substances, proceeds and other
        items of evidence in their yards;

l.      That based upon my training and experience, I know that controlled substance
        traffickers/distributors often use safes, storage units and other such items to store
        controlled substances, currency and other assets;

m.      That based on my training and experience, I know that controlled substance

3

traffickers/distributors often utilize Western Union, Money Orders, Federal Express, United Parcel Service, the U.S. Postal Service and other shippers to ship controlled substances, U.S. currency, receipts for which are many times maintained on the premises or person;

n.   That based on my training and experience, I know that controlled substance traffickers/distributors often utilize cellular telephones, pagers and computers to communicate with members of their organization to arrange the acquisition and distribution of controlled substances as well as the receipt of the proceeds received from the distribution of controlled substances. The affiant also knows based on my training and experience, that controlled substance traffickers/distributors frequently obtain these cellular telephone(s) and pagers under nominee and/or fictitious names. Additionally, the affiant knows based upon his training and experience that it is common for controlled substance traffickers/distributors to store names and numbers of individuals the traffickers have contacted.

5)   The facts stated below were provided by SA Woodson to SA Fillinger. Observations and facts specifically attributed to SA Fillinger are noted as such.

6)   SA Woodson has reviewed Wyoming Division of Criminal Investigation (DCI) reports that indicate that on November 26, 2007, James ANDREWS[1] contacted an individual

---

[1]   ANDREWS was providing information to law enforcement in hopes of receiving consideration on pending criminal drug charges. ANDREWS has previous arrests for arson, burglar, larceny, property destruction, probation violation, distribution of a controlled substance in a school zone, distribution of a counterfeit controlled substance, accessory before the fact of distribution of a controlled substance and family violence assault. Information provided by CS-3 revealed that while ANDREWS was claiming to cooperate with law enforcement he was also

4

who advised ANDREWS that GODARD had cocaine for sale.  The individual advised ANDREWS to contact GODARD at 541-520-0600.[2]   The report indicates that on November 27, 2007, ANDREWS sent a text message to GODARD.  GODARD invited ANDREWS to GODARD's apartment, 1624 Draw Street, Cody, Wyoming.  ANDREWS advised that ANDREWS went to the apartment and knocked on the door.  ANDREWS advised that GODARD answered the door with a pistol in his right hand.  ANDREWS described the pistol as a black semi automatic with an extended magazine and an attached flashlight.  ANDREWS advised that GODARD was turning the flashlight on and off. ANDREWS advised that another male known as "Will", subsequently identified as William HAIRE, was at the residence.  ANDREWS advised that GODARD sat the pistol down on a computer desk next to four or five stacks of U.S. currency, each of which were six to seven inches tall and were wrapped in yellow rubber bands.  GODARD was packing duffle bags preparing for a trip to Oregon.

7)   During the meeting, GODARD told ANDREWS that GODARD had good connections in Oregon for "BC bud"[3] and cocaine.  GODARD told ANDREWS that GODARD traveled from Cody, Wyoming to Bozeman, Montana, Eugene, Oregon and Arizona and back to Cody, transporting controlled substances including psilocybin mushrooms.  GODARD

---

involved in the distribution of additional controlled substances for GODARD.  CS-3 has provided extremely reliable information to date.

[2]   Verizon Wireless records indicate that this number is subscribed to Ryan M. GODARD at 119 Briefcliff Lane, Eugene, Oregon.

[3]   The affiant knows, based upon his training and experience, that this is a slang term used to describe very high quality marijuana, which is usually imported from Canada.

5

showed ANDREWS approximately two grams of cocaine and advised the CS that the cocaine was 85% pure. ANDREWS advised that ANDREWS observed HAIRE use some of this cocaine. GODARD then offered ANDREWS some of the cocaine. ANDREWS advised GODARD that ANDREWS did not like cocaine. GODARD advised ANDREWS that if ANDREWS wanted to sell cocaine then ANDREWS should try it out. ANDREWS then used some of the cocaine. ANDREWS asked GODARD about the cost of the cocaine. GODARD advised ANDREWS that GODARD did not like to deal in smaller quantities, however if the CS wanted smaller quantities, GODARD would charge $100.00 per gram or $320.00 per one-eighth ounce. GODARD told ANDREWS that GODARD would only deal with ANDREWS. GODARD then pointed the pistol at ANDREWS and shined the flashlight into ANDREWS's face. ANDREWS advised that GODARD then said, "I will only deal with you and if anyone ever rats they'll get one of these in the head."[4] ANDREWS asked GODARD about the possibility of obtaining cocaine in the next couple of days. GODARD advised ANDREWS that GODARD would not be in Cody, Wyoming for the next 10 days but that ANDREWS could obtain cocaine from HAIRE.

8)  On November 29, 2007, ANDREWS, acting at the direction of law enforcement, traveled to 1624 Draw Street, Cody, Wyoming to purchase one eighth ounce of cocaine from HAIRE. ANDREWS provided HAIRE with $320.00 in official funds and received a

---

[4]     S/A Woodson believes that GODARD was warning ANDREWS not to attempt to introduce anyone to GODARD and that if anyone provided information to law enforcement about GODARD that GODARD would shoot them in the head.

purported eighth ounce of cocaine.[5]  This purchase was surveilled by agents of DCI and was monitored via a wireless transmitter as well as being recorded.

9)    On November 30, 2007, ANDREWS acting at the direction of law enforcement again traveled to 1624 Draw Street, Cody, Wyoming to purchase one eighth ounce of cocaine from HAIRE. This purchase was surveilled by DCI agents as well as being monitored via a wireless transmitter and recorded. ANDREWS entered 1624 Draw Street and met with HAIRE. ANDREWS provided HAIRE with $320.00 in official funds and HAIRE gave ANDREWS the purported cocaine.[6]  ANDREWS asked HAIRE what type of gun GODARD was carrying. HAIRE advised ANDREWS that the gun was a Glock 17. ANDREWS asked HAIRE how many rounds the gun would hold with the extended magazine. HAIRE responded that it would hold 33 rounds of ammunition. HAIRE then advised CS-2 that HAIRE only had two grams of cocaine left

10)   On November 30, 2007, ANDREWS again acting at the direction of law enforcement, returned to 1624 Draw Street, Cody, Wyoming to purchase the purported two grams of cocaine from HAIRE. This purchase was surveilled and recorded by DCI agents. ANDREWS asked HAIRE how much cocaine HAIRE had left. HAIRE advised that he had two "g's" (grams). ANDREWS provided HAIRE with $200.00 in official funds and HAIRE provided ANDREWS with the two grams of cocaine.[7] ANDREWS asked HAIRE

---

[5]      S/A Woodson sent the purported cocaine to the DEA laboratory for analysis. This analysis revealed that the substance was 3.5 grams of 73% pure cocaine.

[6]      S/A Woodson sent the purported cocaine to the DEA laboratory for analysis. This analysis revealed that the substance was 3.5 grams of 72.2% pure cocaine.

[7]      S/A Woodson sent the purported cocaine to the DEA laboratory for analysis. This analysis revealed that the substance was 1.8 grams of 75.7% pure cocaine.

7

when HAIRE would have more. HAIRE advised that "be awhile, probably when Ryan (GODARD) gets back." HAIRE advised that GODARD would probably return in 10 days to two weeks. (Agents are aware that GODARD frequently travels back and forth between Cody, Wyoming, and Eugene, Oregon.)

11) On December 6, 2007, ANDREWS advised that GODARD sent a text message that said, "I got 28g of goOd snOw. 2 days ud have 2 mOb 2 mONTANA" In another message, GODARD said, "K I cAn do 29g snw 28g hela bOm greEn" ANDREWS advised agents that GODARD was asking if ANDREWS wanted to purchase one ounce of cocaine and one ounce of high grade marijuana. GODARD initially advised ANDREWS that ANDREWS would need to travel to Columbus, Montana to obtain the drugs.

12) S/A Woodson reviewed a report that indicates that on December 7, 2007, agents interviewed CS-2.[8] CS-2 advised that CS-2 had known Tabitha ARMSTRONG for three and one-half years. CS-2 advised that during this time CS-2 had supplied ARMSTRONG with controlled substances on numerous occasions. CS-2 stated that during the fall of 2006, CS-2 purchased one-half grams methamphetamine from ARMSTRONG approximately ten times. On December 7, 2007, DCI agents utilized CS-2 to arrange the purchase of cocaine from Tabitha ARMSTRONG. CS-2 advised that ARMSTRONG claimed that her source of cocaine was from Columbus, Montana and would come to Wyoming if ARMSTRONG "made it worth his while." CS-2 advised ARMSTRONG that CS-2 wanted one-quarter ounce of cocaine. ARMSTRONG advised that

---

[8]    CS-2 is providing information in hopes of receiving consideration on pending criminal drug charges. CS-2 has four previous arrests for delivery of a controlled substance. CS-2 has provided reliable information and has purchased controlled substances at the direction of law enforcement.

8

ARMSTRONG would call her source.   ARMSTRONG advised that ARMSTRONG's source would travel to Wyoming and that the cost would be $350.00 per one-eighth ounce or $700.00 for one-quarter ounce.  The report indicates that on December 7, 2007, CS-2 met ARMSTRONG in Powell, Wyoming and entered ARMSTRONG's vehicle. ARMSTRONG and CS-2 left the area.  Agents followed ARMSTRONG to 1624 Draw Street, Cody, Wyoming.  CS-2 provided ARMSTRONG with $700.00 in official funds. ARMSTRONG exited the vehicle and entered 1624 Draw Street, Cody, Wyoming.  A few minutes later ARMSTRONG returned to the vehicle and provided the purported one-quarter ounce of cocaine[9] to CS-2.  ARMSTRONG then drove CS-2 back to Powell, Wyoming.   S/A Pennell informed S/A Woodson that surveillance agents observed GODARD's truck bearing Oregon license plates parked at 1624 Draw Street, Cody, Wyoming, during the time that ARMSTRONG obtained the cocaine.  S/A Pennell also advised that ARMSTRONG frequently utilized text messaging to arrange the cocaine transaction with CS-2.

13)   On December 30, 2007, ANDREWS received a text message from GODARD, which read, "Help me hoMey"  ANDREWS responded by asking what GODARD needed. GODARD, said, "2 get ridDa these boOMS ros s is slaCking."  S/A Woodson believes GODARD was requesting ANDREWS distribute psilocybin mushrooms for GODARD. GODARD advised ANDREWS that Ross GILMORE was not selling enough at the time.

14)   On January 2, 2008, ANDREWS, acting at the direction of law enforcement, sent and received text messages in the presence of law enforcement to and from GODARD.

---

[9]   S/A Woodson sent this cocaine to the DEA laboratory for analysis.  This analysis revealed that the substance was 6.3 grams of 64.8% pure cocaine.

9

ANDREWS said, ". . . u stil need 2 get rid of those" In response, GODARD said, "CAL ROSS" S/A Woodson believes ANDREWS asked, GODARD if GODARD still had psilocybin mushrooms available for sale.  In turn, GODARD advised ANDREWS to contact Ross GILMORE.

15) On January 2, 2008, ANDREWS acting at the direction of law enforcement sent a text message to GILMORE asking if GILMORE had any psilocybin mushrooms left. GILMORE replied that he had "P." ANDREWS advised that this meant GILMORE had a pound of mushrooms left.  GILMORE further advised that GODARD had left Bozeman, Montana today.   GILMORE advised that GILMORE would contact ANDREWS when GODARD returned.

16) On January 2, 2008, ANDREWS, acting at the direction of law enforcement, placed a recorded telephone call to GILMORE. GILMORE advised that he only had one pound of psilocybin mushrooms left.  ANDREWS asked GILMORE if GILMORE had found a scale that weighed in pounds instead of ounces so that GILMORE did not have to weight nine pounds of psilocybin mushrooms out in ounces.  GILMORE confirmed that he had found a scale.  GILMORE advised that GODARD should return to Montana in about a week. ANDREWS advised GILMORE that GODARD should try to obtain some "acid" (LSD).   GILMORE agreed.   ANDREWS asked GILMORE what GILMORE was charging for the psilocybin mushrooms.  GILMORE advised that he was selling one-quarter pound quantities for $500.00 each.

17) S/A Woodson has reviewed a report that indicates that on January 15, 2008, DCI agents received information from a person.  The person advised that the person would not wear a wireless transmitter for law enforcement but wanted to provide information regarding

10

drug activity in Park County, Wyoming. In part, the person advised that on December 25, 2007, the person observed GODARD at his apartment on Draw Street in Cody, Wyoming with ANDREWS and "Ross" from Bozeman.[10] The person stated that GODARD was in possession of a suitcase containing an estimated four or five pounds of psilocybin mushrooms. The person advised that Ross was bragging that he was wearing an ankle bracelet as part of his probation and was deceiving his probation officer.[11]

18)     S/A Woodson has reviewed a report that indicates that on January 29, 2008, ANDREWS advised that GODARD sent a text message to ANDREWS. GODARD advised that GODARD was in Bozeman, Montana with psilocybin mushrooms, marijuana and morphine tablets for sale.

19)     On January 29, 2008, a few minutes after sending the text message, GODARD called ANDREWS. This conversation was recorded by the affiant and DCI S/A Glick. During the conversation GODARD told ANDREWS that GODARD was in Bozeman, Montana with GILMORE. GODARD advised that he did not have any "white" (cocaine) or "cid" (LSD) with him. In response to ANDREWS's request for "shrooms," GODARD advised that GODARD has already sold them (psilocybin mushrooms) to GILMORE. GODARD advised ANDREWS that GODARD was in possession of "chronic"[12] at a cost of $300.00 per ounce and 400 morphine tablets. GODARD told ANDREWS to come to Bozeman,

---

[10]     S/A Woodson believes that "Ross" is a reference to Ross GILMORE, whose activities are detailed in this affidavit.

[11]     S/A Woodson reviewed Montana Department of Corrections records indicate that GILMORE is on intensive supervised release.

[12]     S/A Woodson knows this is a slang term utilized to describe high quality marijuana.

Montana, with $2,000.00 and GODARD would provide ANDREWS a good deal on the morphine. ANDREWS attempted to get GODARD to travel to Wyoming. GODARD advised that GODARD would possibly meet ANDREWS near the Wyoming line but would not travel to Wyoming. GODARD told ANDREWS to find a ride and to watch out for law enforcement. GODARD reminded ANDREWS that if anyone ever mentioned his name that GODARD would shoot them. ANDREWS advised GODARD that ANDREWS knew what GODARD meant and had seen GODARD's gun previously. Analysis of toll records confirms this telephone call.

20)  On February 27, 2008, S/A Woodson began receiving information from CS-3.[13] The information revealed that GODARD was in the Cody and Powell, Wyoming area distributing cocaine, marijuana and mushrooms to numerous individuals.

21)  On February 28, 2008, S/A Woodson received information via CS-3 that GODARD was in Powell, Wyoming and was going to distribute cocaine and marijuana to a female. Agents established surveillance at GODARD's location and GODARD's Dodge pickup bearing Oregon license plates 648-CLU.[14] The agents observed the female arrive and leave a short time later. Agents arranged for a traffic stop on the vehicle with the female. A subsequent search resulted in the seizure of cocaine and marijuana.[15] The female was released.

---

[13]  CS-3 has provided extremely reliable information that has led to the seizure of cocaine, marijuana and mushrooms.

[14]  Oregon vehicle records indicate that this license is registered to Ryan Martin Godard at 119 Briarcliff, Eugene, Oregon on a 2002 Dodge pickup.

[15]  S/A Woodson sent the marijuana and cocaine to the DEA laboratory for analysis. This analysis confirmed that the substances were marijuana and cocaine.

22)     On March 1, 2008, S/A Woodson received information from CS-3 that GODARD traveled to Belgrade, Montana to collect $3,000.00 owed to GODARD by GILMORE for previously delivered controlled substances.   The information further indicated that GODARD was arranging to obtain morphine pills from a source in Eugene, Oregon.  The information from CS-3 indicated that GILMORE was using cellular telephone 406-600-1361.[16]

23)     Information received via CS-3 indicated that GODARD and Bailey CHAPIN returned to Oregon during the first week of March, 2008.  While there GODARD and CHAPIN obtained approximately 400 morphine tablets for distribution in Montana and Wyoming. Additionally, the information indicated that GODARD obtained approximately twenty pounds of psilocybin mushrooms and an unknown amount of marijuana for distribution in Montana and Wyoming.  Information received via CS-3 indicated that CHAPIN is using cellular telephone 360-719-9038.[17]

24)     CHAPIN and GODARD returned to Belgrade, Montana around March 5, 2008 with the drugs.   Information received via CS-3 indicated that GODARD distributed controlled substances to CHAPIN and GILMORE who in turn distributed them to other individuals.

25)     On March 8, 2008, S/A Woodson received information via CS-3 that GILMORE and CHAPIN were distributing multiple pound quantities of psilocybin mushrooms in the Belgrade and Bozeman, Montana area.   Additionally, the information indicated that

---

[16]     Verizon wireless records indicate that this number is subscribed to Abigail McCarty at 115 Chisler Drive, Belgrade, Montana.

[17]     T-Mobile records indicate that this number is subscribed to Bailey A. CHAPIN at 103 E. Magnolia Drive, Belgrade, Montana.

13

GODARD was traveling to Cody, Wyoming to distribute psilocybin mushrooms, morphine pills and cocaine.

26)   On March 8, 2008, information received via CS-3 indicated that GODARD was distributing one quarter pound of psilocybin mushrooms to ANDREWS and another individual. Agents established surveillance at 1624 Draw Street, Cody, Wyoming and observed GODARD's pick up at this location. Subsequently, the agents observed ANDREWS and other individuals arrive at the residence. After leaving the residence, agents arranged for ANDREWS' vehicle to be stopped. A subsequent search resulted in the seizure of one-quarter pound of psilocybin mushrooms.[18] No one was arrested at this time.

27)   Information received via CS-3 revealed that after the seizure of the mushrooms from ANDREWS, GODARD was alerted that law enforcement may be watching him. GODARD subsequently left Wyoming and returned to Belgrade, Montana. The information further indicated that on March 9, 2008, GODARD obtained a storage unit in Belgrade, Montana. GODARD described this storage unit as being "just right over by the rail road tracks."

28)   S/A Fillinger conducted surveillance in Belgrade, Montana on March 17, 2008, and confirmed that vehicles registered to GODARD, and GILMORE were located at 103 E. Magnolia, Belgrade, Montana, and 401 N. Weaver, Belgrade, Montana.

29)   Around this time, information received via CS-3 indicated that GODARD was in possession of a pistol and had purchased a new 12 gauge Mossberg shotgun. The

---

[18]   S/A Woodson sent the mushrooms to the DEA laboratory for analysis. This analysis has not been completed.

14

information indicated that GODARD was attempting to collect money owed for previously delivered controlled substances from CHAPIN, GILMORE and others.

30)   On March 19, 2008, information received via CS-3 indicated that GODARD returned to the Eugene, Oregon area.

31)   On March 22, 2008, information received via CS-3 indicated that GODARD was considering obtaining LSD for distribution in Montana and Wyoming. Additionally, the information indicated that GILMORE was considering obtaining multiple pound quantities of marijuana from a source in Arizona.

32)   On March 29, 2008, information received via CS-3 revealed that CHAPIN had taken a Remington, model 710, 7 millimeter magnum rifle as collateral for a pound of controlled substance. The information indicated that CHAPIN had charged the person $2,500.00 for the pound of controlled substance.

33)   On April 2, 2008, information received via CS-3 indicated that GODARD was obtaining morphine pills for distribution in Montana and that GODARD would leave for Montana on Sunday or Monday.

34)   On April 4 and 5, 2008, information received via CS-3 indicated that CHAPIN was storing money for GODARD in Belgrade, Montana. The information indicated that GODARD had a large amount of drugs "locked up" in Belgrade, Montana for re-distribution.

35)   On April 7 and 8, 2008, information received via CS-3 indicated that GODARD was traveling from Oregon to Belgrade, Montana with controlled substances. The information also indicated that GODARD had $50,000.00 cash available, which may be stored in a safety deposit box in Oregon.

36)     On April 8, 2008, information received via CS-3 indicated that CHAPIN traveled to Butte, Montana to distribute a pound of controlled substances, believed to be psilocybin mushrooms, to an individual. The information further revealed that GODARD was traveling to GILMORE's residence to deliver controlled substances.

37)     On April 8, 2008, S/A Fillinger conducted surveillance, following GODARD traveling on I-90. S/A Fillinger followed GODARD to GILMORE's residence, 401 N. Weaver, Belgrade, Montana. S/A Fillinger observed GODARD remove an extremely large suit case from the bed of his pick up and enter 401 N. Weaver, Belgrade, Montana. Subsequently, GODARD exited 401 N. Weaver, Belgrade, Montana with the suit case and was followed to CHAPIN's residence, 103 E. Magnolia, Belgrade, Montana.

38)     On April 8, 2008, agents conducted surveillance at 401 N. Weaver, Belgrade, Montana, and observed a passenger car arrive at the residence approximately ten minutes after GODARD had left. S/A Fillinger observed a male and female, later identified as Sara BIEHL and Shaun MARTIN enter the residence and remain for approximately ten minutes. BIEHL and MARTIN then left in the vehicle. The vehicle was followed and later stopped in Bozeman, Montana, by the Montana Highway Patrol. A search warrant was later applied for and the vehicle was searched on April 9, 2008. A marijuana pipe and a small amount of marijuana were seized.

39)     On April 9, 2008, S/A Fillinger contacted Bridger Mountain Mini Storage, located at 424 Briar Place, Belgrade, Montana. S/A Fillinger was advised that storage unit # 188 was rented by Ryan GODARD.

40)     S/A Woodson has advised that information received via CS-3 indicates that GODARD has stored multiple pounds of psilocybin mushrooms inside the storage unit.

41)     On April 9, 2008, Deputy D. Peterson of the Gallatin County Sheriffs Office, and his K9 "Noe" conducted an exterior sniff of Bridger Mini Storage # 188, 424 Briar Place, Belgrade, Montana. The K9 began the sniff at unit # 193 and continued north, directing the K9 to sniff the area of each unit up to and including # 188. At unit # 188 the K9 indicated to the presence of illegal drugs. No alerts or indications were given to any other units sniffed. The K9 was then directed to continue to sniff up to unit # 185, and did not indicate on any unit. The process was completed a second time in the opposite direction, at which time the K9 alerted a second time on unit # 188. Deputy Peterson is a certified "Master Handler" through the American Society of Canine Trainers (ASCT) and certified to handle canine "Noe" with the Gallatin County Sheriff's Officer. K-9 "Noe" is trained and currently certified by the ASCT in the detection of marijuana, methamphetamine, amphetamine, cocaine, heroin, psilocybin mushrooms, and all of their derivatives. (Last certified on Feb. 1, 2008, and his certificate number is DP-SMH08 through the ASCT.)

_____
BRYAN FILLINGER, SPECIAL AGENT
DRUG ENFORCEMENT AGENCY

Sworn and Subscribed
Before me this /04/ day of April, 2008.

_____
JEREMIAH C. LYNCH
United States Magistrate Judge

17